OPINION OF THE COURT
Robert D. Lippman, J.
Defendants move to dismiss the complaint; the People cross-move to lift the stay.
Defendants, loft tenants of 150 W. 26th Street, New York City, are charged with making alterations in their respective dwelling units without obtaining a permit from the Department of Buildings, in violation of the Administrative- Code of the City of New York §§ C26-85.5, C26-86.5 (a); § C26-86.5 (g), predicated upon §§ C26-114.1 and C26-119.3.
*109 In my decision of May 16, 1986, I granted a stay of the proceedings based on the desirability of waiting for the outcome of a related Supreme Court action which would determine, among other issues, whether the subject building is an interim multiple dwelling. I reasoned then that if the building in question is an interim multiple dwelling, the Loft Board, created under article 7-C of the Multiple Dwelling Law, might be the appropriate forum for resolving the charge that defendants failed to comply with the Building Code.
Evidence submitted by defendants with the moving papers indicates that the building is now registered as an interim multiple dwelling. Its status having been clarified, there is no further need to await a determination by the Supreme Court as to this issue, and, since the basis for the stay no longer obtains, the stay is hereby lifted.
In bringing on this motion to dismiss, defendants argue that since the building is an interim multiple dwelling (IMD), the Loft Board is the appropriate body to oversee the process of bringing the building into compliance with the Building Code, and, that being under the protection of the Loft Law, criminal proceedings are inappropriate.
The issue raised by defendant’s contention is whether the provisions of the Loft Law shield against criminal prosecution tenants of an interim multiple dwelling who, in violation of the Administrative Code, failed to obtain alteration permits from the Building Department. I hold that they do not.
Multiple Dwelling Law article 7-C, titled "Legalization of Interim Multiple Dwellings” but generally known as the "Loft Law”, was enacted upon a finding by the Legislature of a serious public housing emergency which resulted in an increasing number of conversions of commercial and manufacturing loft building to residential use without compliance with applicable building codes and without compliance with local laws regarding minimum housing maintenance standards for health, safety and fire protection. (Multiple Dwelling Law § 280.)
The Loft Board was created under article 7-C to oversee the process of bringing interim multiple dwellings into compliance with minimum housing standards. (Multiple Dwelling Law § 282.) By legislative definition then, an IMD is not in compliance with housing codes. Section 282 entrusts the Loft Board with specific duties, among which are "the issuance * * * and the enforcement of rules and regulations governing minimum *110 housing maintenance standards in interim multiple dwellings (subject to * * * any local building codes)”. The limitation, i.e., "subject to * * * any local building codes”, indicates that the Loft Board, in issuing and enforcing rules and regulations, must conform to and not exceed or deviate from existing building codes pertaining to public health and safety.
The section further grants the Loft Board the power to punish violations of any rule or regulations it has promulgated by a civil penalty to be determined by the Loft Board not to exceed $1,000. The power to penalize is expressly restricted to violations of its own rules and regulations and does not extend to statutory violations not embodied in them.
Section 284 of the Loft Law outlines the obligations of the owner of an IMD. Among the owner’s obligations is the requirement to obtain an approved alteration permit (Multiple Dwelling Law § 284 [1] [i] [A], [B]). Section 284 (1) (ii) states that: "If there is a finding by the loft board that an owner has failed to satisfy any requirement specified by paragraph (i) of this subdivision, such owner shall be subject to all penalties set forth in article eight of this chapter.”
Section 300 (1) of article 8 of the Multiple Dwelling Law states: "It shall be unlawful to commence * * * alteration of a multiple dwelling or any part thereof * * * until the issuance of a permit by the department”.
And section 304 (1) of article 8 provides that "every person who shall violate or assist in the violation of any provision of this chapter shall be guilty of a misdemeanor”.
Thus, a criminal action may be brought against the owner of an interim multiple dwelling provided, however, that there has been a prior finding by the Loft Board that the owner has failed to comply with section 284. Section 284 is a legislative enactment and not a rule or regulation promulgated by the Loft Board.
Beyond the Board’s initial finding regarding a section 284 violation, article 7-C confers no other jurisdictional power on the Loft Board to penalize for violations of other statutory schemes.
Defendants here do not fall within the ambit of section 284 since they are not owners but tenants of an interim multiple dwelling. Because the obligation to bring an IMD into housing code compliance rests with owners and not tenants (Multiple Dwelling Law § 284), the Loft Law nowhere covers the in *111 stance where a tenant fails to comply with requirements to obtain alteration permits. The jurisdiction of the Loft Board does not reach beyond what the Legislature has granted it, and the Loft Law, therefore, offers no shield against civil or criminal liability that attaches to violations of housing statutes or codes outside the scheme of article 7-C.
Interim multiple dwellings governed by article 7-C were originally used for commercial or for manufacturing purposes. As commercial buildings, they were not, of course, required to conform to residential housing standards. Once such a building becomes an interim multiple dwelling, the process of bringing it into compliance with minimum housing standards falls under the Loft Law’s provisions. A distinction must be made, however, between housing conditions to be brought into compliance and the process by which compliance is sought. While certain substandard housing conditions are themselves not criminally actionable because protected under article 7-C, the process of compliance, on the other hand, must adhere to the requirements set out in section 284, or, if not covered there, to other applicable statutes. As already pointed out, article 7-C is focused on the obligations of owners in the compliance process. (Enki Props. v Loft Bd., 128 Misc 2d 485 [Sup Ct, NY County 1985].) Owner failure to meet those obligations is punishable by the Loft Board. Tenant violations of this kind are not within its purview.
Defendants here are charged with making alterations for residential use without first obtaining approved plans and permits from the Building Department. The basis for the allegations herein derives from alleged violations of Administrative Code §§ C26-114.1 and C26-119.3, not of the Loft Law. Legislative concerns for health, safety and fire protection embodied in these housing codes would be negated if defendants here were relegated to a forum powerless to enforce these statutory provisions. The Loft Law cannot insulate defendants against charges of violating housing statutes where the violations are of a nature not covered by article 7-C.
Defendants’ claim that they are protected by the Loft Law against criminal prosecution is not well founded.
Accordingly, defendants’ motion to dismiss is denied. People’s cross motion to lift the stay is granted.
The matter is to be set for trial in Part SAP II.